IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Adela E. Bickford, ) | Civil Action No. 5:05-1457-MBS-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Denmark Technical College, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, Adela E. Bickford ("Bickford"), filed this case on May 19, 2005. She alleges that her former employer, Denmark Technical College ("DTC"), discriminated against her because of her national origin in violation of Title VII and her age in violation of the Age Discrimination in Employment Act ("AEDA"). She further alleges retaliation under both statutes.[1] DTC filed a motion for summary judgment on April 17, 2006. Bickford filed a memorandum in opposition on May 30, 2006. DTC filed its reply on June 6, 2006. Pretrial matters were automatically referred to the undersigned pursuant to Local Rule 73.02(B)(2)(g).

**Standard for Summary Judgment**

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that

---

[1] By order filed October 26, 2005, Joann R.G. Boyd-Scotland ("Boyd-Scotland") was dismissed as a defendant in this action.

summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir.

1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

**Facts**

The following facts are either undisputed or are stated in the light most favorable to Bickford:

1. Bickford is of Hispanic descent. (Pl. Dep. 6).

2. Bickford was born June 28, 1943 (Id.).

3. Boyd-Scotland is President of DTC.

4. Bickford was hired as secretary to Boyd-Scotland on September 2, 1997. (Id. at 24).

5. At that time, Valerie Turner ("Turner") was an administrative assistant to Boyd-Scotland. (Id. at 28).

6. Turner left in March of 1998 and Bickford became Boyd-Scotland's administrative assistant and secretary. (Id. at 43).

7. In January of 1999, Secil Jackson was hired as Boyd-Scotland's secretary and Bickford remained as administrative assistant (Pl. Dep. 52, Jackson Aff., ¶ 1).

8. In April of 2001, Bickford prepared a letter for Boyd-Scotland in response to an invitation. Boyd-Scotland complained to Bickford that the draft was not "wordy enough." During their conversation, Boyd-Scotland told Bickford, "we don't do things like your people do." (Pl. Dep. 100).

9. Jackson left in January of 2002, and Cindy Jordan ("Jordan") replaced her as Boyd-Scotland's secretary. (Jackson Aff., ¶ 1 and Jordan Aff., ¶ 1).

10. Bickford maintained a personal calendar on which she noted things which occurred at work. In October of 2002, Bickford returned to work after being out several days due to a back injury. Bickford made a claim due to this injury. Boyd-Scotland was angry over the claim. Boyd-Scotland "snatched" Bickford's 2002 calendar from Bickford as she was making a notation on it and has never returned it. (Pl. Dep. 88-89, 104).

11. On July 2, 2003, Boyd-Scotland sent Bickford into the rain to obtain a transcript. Bickford fell injuring her knees and hands. Boyd-Scotland told Bickford that she was getting old and must need glasses. Bickford was not allowed to seek medical attention until after Boyd-Scotland returned from lunch. (Id. at 110-12).

12. In January of 2003, Boyd-Scotland required Bickford to work on a Saturday due to DTC's homecoming despite the fact that Bickford was suffering from back pain. Bickford continued to take Motrin for her back pain which led to a hospital admission for renal failure. (Id. at 113-14).

13. In December of 2003, Bickford applied for a job as DTC's bookstore manager. The position was not filled. (Id. at 126-27).

14. In January of 2004, Boyd-Scotland asked Bickford for a document that Boyd-Scotland thought she had given to her. Bickford told Boyd-Scotland that she did not give her the document. Boyd-Scotland insisted otherwise and told Bickford that she "must be getting old because [Bickford] couldn't remember nothing." (Id. at 120).

15. At the end of the work day on February 10, 2004, Boyd-Scotland screamed at Bickford for allegedly giving out personal and confidential information about a DTC

employee over the telephone. Boyd-Scotland told Bickford that when she was not around, Bickford "wasn't capable of doing what [Bickford] was supposed to be doing." (Id. at 143). Boyd-Scotland reached across Bickford's chest, touching her, while pointing to Bickford's purse and told Bickford to "get out." Bickford left. (Id. at 144-48).

16. On the night of February 10, 2004, Boyd-Scotland telephoned Bickford and instructed her to take 10 days of accumulated "comp time" before returning to work. Boyd-Scotland hung up on Bickford without responding when Bickford asked Boyd-Scotland if she still had a job. (Id. at 151-52).

17. Bickford was scheduled to return to work on February 25, 2004. On the night of February 24, Boyd-Scotland telephoned Bickford and told her not to come to work. Again, Boyd-Scotland refused to answer when Bickford asked if she still had a job.

18. Boyd-Scotland telephoned Bickford at 6:00 a.m. on February 26 and told her to take the day off. (Id. at 154).

19. At 6:30 a.m. on Friday, February 27, Boyd-Scotland telephoned Bickford and told Bickford to meet her at DTC's Barnwell site. The Barnwell site was open for classes only in the evenings to accommodate students from that area. When they met, Boyd-Scotland gave Bickford a letter telling her that she had been transferred to the Barnwell site. The letter advised that Bickford's new job responsibilities would be given to her at a later time. (Id. at 154-59).

20. Bickford was allowed to return to her old office to retrieve personal belongings and supplies after 4:30 p.m. on February 27 (Id. at 160).

21. On the Sunday prior to her return to work at the Barnwell site, Bickford was hospitalized with chest pains. She was released on Monday, March 1, 2004, and obtained a doctor's statement that she should not work on March 2 and 3. (Id. at 168-69).

22. Bickford telefaxed the doctor's note to Boyd-Scotland and telephoned her on March 1 after release from the hospital. (Id. at 170).

23. On March 2, 2004, Bickford's attorney wrote Boyd-Scotland and informed her that "we will consider that [Bickford] has been constructively discharged." (Def. Mem., Ex. 1).

24. Bickford did not report to work on March 4, 2004 as scheduled. (Pl. Dep. 171).

25. Bickford applied for unemployment compensation on March 10, 2004. (Id. at 172).

26. DTC paid Bickford as though she were employed on March 15, 2004. (Id. at 174).

27. On March 25, 2004, Boyd-Scotland wrote Bickford and instructed that "(i)f you have resigned or intend to resign or otherwise change your status of employment with the College, please advise in writing by Wednesday, March 31, 2004." (Def. Mem., Ex. 3). Bickford did not respond. (Id. at 175).

28. On April 15, 2004, Boyd-Scotland wrote Bickford and informed her that DTC considered that she had abandoned her employment. (Def. Mem., Ex. 4).

## Discussion

A. Disparate Treatment

Bickford alleges that she was involuntarily transferred to the Barnwell site and constructively discharged due to her national origin and age. In a disparate treatment case, such as

6

this, Bickford must prove that "but for" her national origin an age, she would not have been subjected to an adverse employment action. Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986). She can prove DTC's motive to discriminate in one of two ways. First, Bickford "may meet this burden under the ordinary standards of proof by direct and indirect evidence relevant to and sufficiently probative of the issue. In the alternative, a plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 91981)." EEOC v. Clay Printing Co., 955 F.2d 936 (4th Cir. 1992).

    1.    Direct Evidence

Bickford asserts that she has produced sufficient direct and circumstantial evidence of national origin discrimination to avoid summary judgment. (Pl. Mem., 18-20). The undersigned disagrees.

Direct evidence is evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor...." Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), *cert. denied*, 454 U.S. 860 (1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds,* Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (evidentiary standard for mixed motive analysis).

The only direct evidence that Bickford cites is Boyd-Scotland's 2001 comment that "we don't do things like you people do" in discussing a letter Bickford had prepared for Boyd-Scotland.

The statement is subject to several interpretations. Bickford argues that Boyd-Scotland was referring to her Hispanic heritage. Even if this argument is accepted, the comment was made almost three years prior to Bickford's transfer to the Barnwell site and has no direct bearing on that decision.[2]

Bickford cites certain instances which she argues are sufficient circumstantial evidence to establish national origin discrimination. She argues that Boyd-Scotland treated her differently than non-Hispanic employees because Boyd-Scotland screamed at her, criticized her punctuality, denied or delayed leave requests, and enforced DTC's dress code unequally. This evidence is not sufficient probative value to establish discriminatory animus based upon Bickford's national origin.

2. Prima Facie Case

In Hill v. Lockheed Martin Logistics Mgt., Inc., 354 F.3d 277. 285 (4th Cir. 2004), the Fourth Circuit noted that establishing a prima facie case of discrimination under Title VII and the ADEA relies on the same analytical framework. "To demonstrate the prima facie case of [national origin] or age discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employers' legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Id. The parties appear to agree that the only issue is whether or not Bickford's involuntary transfer to the Barnwell campus was an adverse

---

[2] Bickford raises no argument that she has produced direct evidence of age discrimination. The same analysis and conclusion would be reached based on Boyd-Scotland's stray comments about Bickford's age.

8

employment action. DTC argues that it was not. Bickford asserts that the transfer was not only an adverse employment action, but also resulted in her constructive discharge.

In <u>Webster v. Rumsfield</u>, 156 Fed.Appx. 571, 2005 WL 3229753, *7 (4th Cir. 2005), Judge Traxler summarized precedent on this issue:

> "An adverse employment action is a discriminatory act which adversely affects the terms, conditions, or benefits of the plaintiff's employment. Conduct short of ultimate employment decisions can constitute adverse employment action." <u>James v. Booz-Allen & Hamilton, Inc</u>., 368 F.3d 371, 375-76 (4th Cir. 2004). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, **reassignment with significantly different responsibilities**, or a decision causing a significant change in benefits." <u>Burlington Indust., Inc. v. Ellerth</u>, 524 U.S. 742 (1998). (Emphasis added).
>
> Thus, a reassignment can "form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." <u>Boone v. Goldin</u>, 178 F.3d 253, 256 (4th Cir. 1999). However, a mere change in an employee's job assignment, even if "less appealing to the employee, ...does not constitute adverse employment action." <u>Booz-Allen</u>, 368 F.3d at 376. "Absent any decrease in compensation, job title, **level of responsibility**, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." <u>Id</u>. (emphasis added).

The undersigned concludes that in the light most favorable to Bickford, the involuntary transfer to the Barnwell site was an adverse employment action because it resulted in significantly different and lowered responsibilities than she had been performing as administrative assistant to Boyd-Scotland. The record on this issue, however, is not fully developed. No job description for either position is a part of the record. At one point Bickford prepared a written description of her duties as Administrative Assistant to Boyd-Scotland and it was admitted as an exhibit to Bickford's deposition (Pl. Dep. 78). However, no exhibits are attached to the copies of the deposition filed with the parties' memoranda. The letter given to Bickford by Boyd-Scotland on February 27, 2004,

advising her of the transfer[3] stated that "a revised position questionnaire will be communicated...later." (Pl. Dep. 158). However, this was not done as Bickford did not return to work. Boyd-Scotland did not describe Bickford's new duties during her deposition.

Bickford described her duties prior to the transfer during her deposition. These duties varied as Bickford was administrative assistant and at times doubled as secretary when that position was vacant. Generally, Bickford performed duties assigned to her by Boyd-Scotland (Pl. Dep. 39). Basic duties included opening, recording and distribution of mail (Id. at 44); maintaining Boyd-Scotland's calender on her desk (Id. at 80-81); and advising Boyd-Scotland of deadlines (Id. at 44). Bickford was privy to confidential paperwork (Id.) and composed letters for Boyd-Scotland's signature (Id. at 99). As of 2001, Bickford was responsible for maintaining DTC's policies and procedure manual. (Id. at 48-50). Bickford attended weekly meetings of DTC's executive counsel and prepared minutes. (Id. at 55). Bickford gathered paperwork from DTC's administrators and prepared "commission books" for each commissioner. (Id. at 134). Additionally, Bickford was responsible for preparing for meetings of the DTC Board of Directors (Id. at 37), attending the meetings and preparing the minutes. (Id. at 44).

By contrast, the only duties Boyd-Scotland ever assigned to Bickford at the Barnwell site were compiling files for students and listing maintenance problems. (Id. at 159). Vivian Grubbs is now "temporary assistant at Denmark Technical College's Barnwell Site." (Grubbs' Aff. ¶ 2). The only duty she describes is that she is "responsible for opening the Site's building." (Grubbs' Aff. ¶ 3). Citing the depositions of Bickford (Pl. Dep. 159) and Boyd-Scotland (Boyd-Scotland Dep. 213-215), DTC argues that "Bickford's job duties at the Barnwell site were scheduled to be similar to

---

[3]The letter is also not a part of the record.

her duties at the College's main campus...." (Def. Mem., p. 3). However, review of the depositions does not support this board's assertion. Thus, the record does contain some description of Bickford's duties prior to the transfer, but none thereafter except opening the building, filing, and listing maintenance problems. In the light most favorable to Bickford, her responsibilities were significantly reduced.

    3.    Pretext

Concluding that Bickford has established a prima facie case of national origin and age discrimination, the burden shifts to DTC to articulate a legitimate, non-discriminatory reason for transferring her to the Barnwell site. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000). Upon such articulation, the burden shifts back to Bickford to show that the reason articulated by DTC was not the true reason, but merely a pretext for discrimination. Id.

DTC states that it transferred Bickford to the Barnwell site because of her administrative ability and its need to prepare the Barnwell site for a visit by the Southern Association of Colleges and School ("SACS") with respect to accreditation. (Def. Mem., Ex. 8).

The undersigned finds that a jury could reasonably find that DTC's proffered reason is untrue and a pretext for discrimination. First, the record is silent as to whether the SACS accreditation team ever visited and the results if it did. Further, there is no evidence as to what efforts were made by Bickford's apparent replacement, Grubbs, at the Barnwell site. In other words, DTC has produced no evidence of the need to transfer Bickford, or anyone else, to the Barnwell site.

Even more troubling are the circumstances under which the transfer took place. The sequence of events is stated in the "Facts" section above. On February 10, 2004, Boyd-Scotland screamed at Bickford, inferred she was incompetent, struck her while pointing at her pocketbook,

11

and demanded that she leave the office. Bickford thought she had been terminated. Boyd-Scotland called Bickford that night and instructed Bickford to take 10 days of "comp time." Boyd-Scotland refused to answer when Bickford asked if she still had a job. On February 24, 2004, Boyd-Scotland telephoned Bickford and told her not to come in the next day. Again, she did not respond to Bickford's inquiry about her job. Boyd-Scotland telephoned Bickford early in the morning of February 26 and told her to take the day off. Finally on February 27, 2004, Boyd-Scotland telephoned Bickford and told her to meet her at the Barnwell site. Thus for a period of over two weeks, Bickford had been ejected from her place of work and kept in limbo as to whether or not she had been terminated. A jury could easily conclude that in this situation, the transfer to the Barnwell site was not because of the alleged upcoming accreditation by SACS.

  B.  Constructive Discharge

    An employee must show that her employer took "deliberate" action to make the employee's working conditions "intolerable" in an effort to force the employee to resign. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995); Amirmokri v. Baltimore Gas and Elec. Co., 60 F.3d 1126, 1132 (4th Cir. 1995); Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985), cert. denied, 475 U.S. 1082 (1986). Deliberateness exists when the actions of the employer were "intended by the employer as an effort to force the employee to quit." Burns v.AFF-McQuay, Inc., 96 F.3d 728 (4th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). Such intent can be inferred from actual or circumstantial evidence. See Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir.1984), cert. denied, 470 U.S. 1028 (1985). Deliberateness is also shown if company personnel know of the untenable conditions, and take no steps to remedy the situation. Id. "Intolerable" working conditions are assessed by the objective standard of whether a "reasonable person" in the

employee's position would have felt compelled to resign.  Burns, 96 F.3d at 733, EEOC v. Clay Printing Co., 955 F.2d 936, 944 (4th Cir. 1992).  If the employee meets this burden, she then must show that the conduct about which she complains was motivated by discrimination based on her age.  Taylor v. Virginia Union University, 193 F.3d 219 (4th Cir. 1999).  Honor, 383 F.3d at 187 (employer's deliberateness must "be motivated by racial bias").

Based on the circumstances discussed above, the evidence is sufficient to conclude that DTC transferred Bickford to the Barnwell site in order to force her to resign.  Whether the transfer resulted in a work environment that was objectively intolerable is a more difficult question. Normally, "difficult or unpleasant working conditions" do not constitute intolerable conditions. Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1999).  Likewise, a transfer that results in a more stressful work environment has been held not be an adverse employment action.  Boone v. Goldin, 178 F.3d at 256.  Further, a "slight decrease in pay[4] coupled with **some** loss of supervisory responsibilities, is insufficient evidence of constructive discharge." James v. Booz-Allen & Hamilton, 368 F.3d at 378 (internal quotation marks and citations omitted) (emphasis added).  However, the transfer resulted in a move to a less desirable environment, and Bickford was stripped of all meaningful responsibilities as discussed above.  The undersigned concludes that a jury could reasonable find these conditions to be intolerable.

C.    Hostile Work Environment

Bickford appears to allege that she was subjected to a hostile work environment due to her national origin and age.  DTC argues that she has failed to produce sufficient evidence of a hostile work environment to avoid summary judgment.

---

[4]Bickford does not contend that the transfer resulted in a decrease in pay.

To establish a claim for a hostile work environment, Bickford must prove that: (1) the subject conduct was unwelcome; (2) it was based on her national origin and/or age; (3) it was sufficiently severe or pervasive to alter the conditions of her employment and to create a hostile work environment; and (4) it was imputable to the employer. Baqir v. Principi, 434 F.3d 733, 745-46 (4th Cir. 2006).

DTC continues to rely on its argument that Bickford's transfer was not a "discriminatory action" in its argument on Bickford's hostile work environment claim. (Def. Mem., p. 10). Given the conclusion reached above, this argument is without merit. The transfer, coupled with the statements made by Boyd-Scotland are sufficient to defeat DTC's motion for summary judgment on this claim.

D.    Retaliation

To establish a prima facie case of retaliation, it must be demonstrated that:

(1)    the employee engaged in protected activity;

the employer took some adverse employment action against the employee; and

(2)    a causal connection existed between the protected activity and the adverse action.

See Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual, and that his termination was motivated by

discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); see also Duncan v. Commonwealth of Virginia Dep't of Corrections, 9 Fed. Appx. 236, 2001 WL 565672 (4th Cir. May 25, 2001)(unpublished).

A plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity. Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Industries, Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988) and Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

Bickford has not shown that she engaged in a protected activity. She did not use DTC's grievance procedure to report discrimination. She has not identified any person to whom she reported discrimination based on national origin or age.

E.     Opportunity for Advancement

The basis of Bickford's claim in this regard is unclear. Bickford appears to argue that in 1999 Boyd-Scotland would not allow Bickford to take leave to study for an accounting exam which may have prepared her for a position as Comptroller of DTC. (Pl. Dep. 85). However, Bickford took the exam several months later. (Id. at 86). However, there is no evidence that Bickford ever applied for this position. The only position that Bickford appears to have applied for is the position in the DTC bookstore. The record shows that this position was never filled.

**<u>Conclusion</u>**

Based on a review of the record, it is recommended that defendant's motion for summary judgment be granted as to plaintiff's claims for retaliation and interfering with opportunities for advancement and denied in all other respects.

    Respectfully submitted,

    s/Joseph R. McCrorey
    United States Magistrate Judge

November 29, 2006
Columbia, South Carolina